IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA *EX REL.* BRANDON BARRICK,<br><br>                      Plaintiff/Relator,<br>v.<br><br>PARKER-MIGLIORINI INTERNATIONAL, LLC; PARKER INTERNATIONAL, INC. aka PMI FOODS-USA; COTTONWOOD TRADING, LLC; FORTUNA FOODS, LLC; JOHN AND JANE DOES 1-10,<br><br>                      Defendants. | **MEMORANDUM DECISION AND ORDER**<br><br>Case No. 2:12-cv-00381-DB<br><br>District Judge Dee Benson |

      Before the Court is Plaintiff and Relator Brandon Barrick's ("Barrick") Motion for Leave to Amend the First Amended Complaint. (Dkt. No. 55.) On December 22, 2015, the Court granted the Defendants' Motion to Dismiss Barrick's First Amended Complaint. (Dkt. No. 47.) The Court dismissed Barrick's reverse false claim and conspiracy claim under the False Claims Act ("FCA") without prejudice for failure to plead fraud with particularity as required by Rule 9(b) of the Federal Rules of Civil Procedure. (*Id.* at 5.) Additionally, the Court dismissed Barrick's FCA retaliation claim because Barrick failed to allege that Defendants were aware of Barrick's protected FCA activities. (*Id.* at 13.)

      Barrick did not request leave to amend the First Amended Complaint. Therefore, on December 29, 2015, the Clerk of the Court entered a judgment and closed the case. (Dkt. No. 48.) On January 18, 2016, Barrick filed a Motion to Reopen Case and requested time to file a motion for leave to amend the First Amended Complaint. (Dkt. No. 49.) On February 1, 2016, the Court ordered the case reopened to permit Barrick to request leave to amend. (Dkt. No. 54.)

1

On February 14, 2016, Barrick filed the Second Amended Complaint in conjunction with a motion requesting leave to amend. (Dkt. No. 55.) On May 2, 2016, the Court heard oral argument on Barrick's Motion for Leave to Amend.[1] At the hearing, Defendants were represented by Mark Gaylord and Tesia Stanley. Barrick was represented by James Bradshaw, Mark Moffat, Ann Marie Taliaferro, and Robert Cummings. At the conclusion of the hearing, the Court took the motion under advisement. Now being fully advised, the Court renders the following Memorandum Decision and Order.

## BACKGROUND

The Second Amended Complaint is a declined *qui tam* action brought by Barrick, a former employee of Defendants, who is asserting three causes of action under the FCA. (Dkt. No. 55-1.) Barrick contends that false export certificates were obtained for U.S. beef products which claim the beef was destined for Costa Rica, Honduras, and Moldova when the true destinations were either Japan or China. (*Id.* at ¶ 1.) Defendants provide "product procurement, sales, and logistics;" including supplying the needs of local wholesale markets by offering "beef, pork, and poultry to customers throughout the world." (Dkt. No. 35, p. 8–9.)

To understand the scheme Barrick alleges was carried out by Defendants, it is necessary to examine how the exportation of meat and poultry is regulated in the United States. There are two departments within the United States Department of Agriculture ("USDA") that are responsible for overseeing mandatory inspection of all meat products—the Food Safety and Inspection Service ("FSIS") and the USDA Agriculture Marketing Services ("AMS"). (Dkt. No. 55-1, ¶ 40.)

---

[1] The Court asked for oral argument on the narrow issue of whether Barrick's reverse false claim, 31 U.S.C. § 3729(a)(1)(G), and conspiracy claim, 31 U.S.C. § 3729(a)(1)(C), properly allege an avoided obligation as defined by the FCA. (Dkt. No. 64.)

FSIS is responsible for inspecting meat and poultry before export from the United States to ensure the meat complies with USDA standards. (*Id.* at ¶ 42.) The AMS develops Export Verification ("EV") Programs to ensure meat certified for export is compliant with the specific standards of the receiving country where the receiving country has more rigorous standards than the USDA. (*Id.* at ¶ 43.)

Several countries have higher importation standards for U.S. meat than what is required by the USDA for domestic use in the United States. Additionally, several countries have blocked the importation of all U.S. beef. Relevant to Barrick's claims, Japan bans the importation of U.S. beef aged more than thirty months (*see id.* at ¶ 65(e), n.6), Hong Kong has historically placed strict specifications on the importation of U.S. beef (*id.* at ¶ 66(a)–(h)), and China has an absolute ban on U.S. beef importation (*id.* at ¶ 67(a)). Conversely, countries like Costa Rica, Honduras, and Moldova have minimal requirements for the importation of U.S. beef. (*Id.* at ¶¶ 80–81, 74.)

The crux of Barrick's FCA claims is the regulatory burden FSIS imposes on Defendants and the meat packing establishments where Defendants fulfill orders. Barrick alleges that when Defendants seek to export meat outside the United States, the process begins with Defendants placing an order with an establishment. (*Id.* at ¶¶ 117(d), 129(c).) The establishment will then apply for an export certificate and obtain the proper FSIS inspection depending on the destination country. (*Id.* at ¶ 117(k) ("The meat packing facility fills Defendants' order and in doing so causes a USDA inspection to take place at the meat packing facility in accordance with the false destination country as designated by Parker.").) Defendants specify the destination country and, therefore, control which FSIS inspection occurs. (*Id.*)

FSIS does not charge for the inspection of meat during regular business hours as long as the receiving country has the same or lesser inspection requirements as the USDA.  (*Id.* at ¶ 53.)  If the destination country has stricter inspection standards, like Japan and Hong Kong, FSIS charges an hourly rate for a FSIS Voluntary Inspection.  (*Id.* at ¶¶ 54–56.)

The AMS plays an important role when the destination country has higher importation standards than what is required by the USDA for domestic use.  Under AMS's EV Programs, the "AMS reviews and approves companies as eligible suppliers of meat and meat products."  *See* Agricultural Marketing Service, Services, Import & Export Certificates, Bovine, Ovine and Caprine Export Verification Programs, https://www.ams.usda.gov/services/imports-exports/bovine-ovine-and-caprine-export-verification-programs (last visited May 13, 2016) [hereinafter *AMS Export Verification*].[2]  According to the AMS:

> Only eligible suppliers listed in the [USDA's Business Directory] . . . may supply product identified as meeting the requirements of the applicable USDA EV Program.  Eligible product must be produced under an approved Program and be identified as meeting the requirements of the applicable USDA EV Program. Only eligible products may be issued a . . . [FSIS] Export certificate which includes the applicable statement as listed in the FSIS Library of Export Requirements.  The FSIS export certificate validates the products as meeting regulatory guidelines for export.

*Id.*  For example, to export U.S. beef into Japan, "the slaughter and processing establishment . . . must implement a USDA Less Than 30 Months Age Verification Quality System Assessment Program [or QSA LT-30] . . . ."  *See* FSIS, Export Library-Requirements by Country, Japan, http://www.fsis.usda.gov/wps/portal/fsis/topics /international-affairs/exporting-products/export-library-requirements-by-country/Japan (last visited May 13, 2016).  "Only upon completion of a successful on-site audit by [the] AMS of a meat establishment to ensure compliance with QSA

---

[2] (*See also* Dkt. No. 55-1, ¶ 43 ("The AMS is responsible for developing Export Verification ("EV") programs to ensure that establishments certified for export can meet the requirements of importing countries.  The EV Programs outline the specified product requirements for individual countries.").)

LT-30 Program requirements will that meat establishment be approved as eligible to export beef and beef products to Japan." *Id.* Furthermore, the USDA provides a list of compliant QSA LT-30 establishments that are eligible to obtain export certificates for beef bound for Japan. *Id.*

During the period Barrick alleges Defendants violated the FCA, the AMS maintained an EV Program for importing U.S. beef into Hong Kong. (*Id.* at ¶ 66(d)–(f).) According to Barrick, "[t]he EV Program for Hong Kong . . . required an eligible exporter to establish and maintain records evidencing conformity to program requirements, specifying product requirements, and evidencing the effective operation of the exporter's [Quality Management System]." (*Id.* at ¶ 66(e).) Furthermore, only "[e]ligible products produced by eligible exporters and identified as meeting the requirements of the EV Program receive[d] a FSIS Export Certificate with the statements 'Products Meet EV Program Requirements for Hong Kong.'" (*Id.* at ¶ 66(f).)

The scheme alleged by Barrick involves the inspection process; specifically, how Defendants obtained export certificates. Barrick alleges two separate schemes:

Japan Scheme
1. Defendants receive an order originating in Japan. (*Id.* at ¶ 129(a).)
2. Defendants place an order with one of a variety of establishments, informing the establishment that the destination of the meat is Costa Rica or Honduras. (*Id.* at ¶ 129(e).)
3. The meat receives a free inspection, pursuant to FSIS's regulations. (*Id.* at ¶ 129(j).)
4. Once the export certificates are obtained, the meat is shipped to Costa Rica or Honduras, repackaged, and then shipped to Japan. (*Id.* at ¶ 129(k)–(n).)

China Scheme
1. Defendants receive an order originating in China. (*Id.* at ¶ 117(a).)
2. Defendants place an order with one of a variety of establishments, informing the establishment that the destination of the meat is Moldova. (*Id.* at ¶ 117(f).)
3. The meat receives a free inspection, pursuant to FSIS's regulations. (*Id.* at ¶ 117(l).)
4. Once the export certificates are obtained, Defendants change the shipping manifestations to Hong Kong. (*Id.* at ¶ 117(m).)

5

      5.   Once the meat arrives in Hong Kong, Defendants use smugglers to traffic the meat into China. (*Id.* at ¶ 117(p).)

Barrick contends that the loss to the government occurs when Defendants obtain a FSIS inspection and exportation certificate for free where the establishment would be required to pay for a FSIS Voluntary Inspection to import U.S. beef into Japan and China. (*Id.* at ¶¶ 117, 129.)

Barrick alleges that the beef shipped to Japan was "banned" U.S. beef product and was ineligible for legitimate importation from the United States into Japan. (*Id.* at ¶¶ 130(g), 136, 162(c).) Similarly, Barrick's First Amended Complaint alleges that the beef shipped into Hong Kong was "banned" U.S. beef product. (Dkt. No. 21, ¶ 81 (stating, Defendants had "been shipping banned U.S. beef products into Hong Kong and China since 2004").)

On April 20, 2012, Barrick filed his original FCA complaint under seal and subsequently provided a copy to the government so that the government could determine whether or not to intervene. (Dkt. No. 1.) After Barrick's disclosure to the government, the FBI initiated a criminal investigation into the Defendants' businesses. (Dkt. No. 55-1, ¶ 141.) Barrick alleges that he aided the FBI's investigation, including wearing a "hidden recording devise" during conversations with Defendants' CFO Steven Johnson ("Johnson"). (*Id.* at ¶ 141(c).) During the FBI's investigation, the FBI interrogated Johnson about "specific facts given to them by [Barrick]." (*Id.* at ¶ 146.) Barrick alleges that the FBI's confrontation of Johnson "inherently conveyed to Johnson" that Barrick was working with the FBI. (*Id.*)

On November 14, 2013, one month after the FBI searched Defendants' business premises, Barrick was terminated from his employment. (*Id.* at ¶ 92.) Barrick alleges that Defendants had actual knowledge that Barrick had been working with the FBI and terminated him in retaliation for his assistance to the FBI. (*Id.* at ¶¶ 181–84.)

As a result of the FBI's investigation, Defendants pled guilty to one count of violating 21 U.S.C. § 611(b)(5), a misdemeanor. (*Id.* at ¶ 15.) Defendants were ordered to pay a $1,000,000 fine. (*Id.*) Specifically, Defendants plead guilty to the following factual allegations:

> On or about March 17, 2011, PARKER INTERNATIONAL INCORPORATED ("PARKER"), did knowingly make a false statement in a shipper's certificate or other nonofficial or official certificate provided in the regulations prescribed by the Secretary of the United States Department of Agriculture ("USDA"); to wit: PARKER did state in an official USDA Food safety and Inspection Service Meat and Poultry Export Certificate of Wholesomeness that its meat products were destined for Moldova, when in fact that statement was not true. That false statement was then relied upon by the USDA during the issuance of export certificates for product, and caused and export certificate to be granted when it otherwise would not have been granted.

(Dkt. No. 39, Ex. B.) Section 611(b)(5) makes it a crime to "knowingly make any false statement in any shipper's certificate . . . ."

## STANDARDS OF REVIEW

Pursuant to Rule 15(a)(2) of the Federal Rules of Civil Procedure, the Court "should freely give leave [to amend] when justice so requires." The Court may deny leave to amend where there is a "showing of undue delay, undue prejudice to the opposing party, bad faith or dilatory motive, failure to cure deficiencies by amendments previously allowed, or futility of amendment." *Bylin v. Billings*, 568 F.3d 1224, 1229 (10th Cir. 2009) (quoting *Frank v. U.S. West, Inc.*, 3 F.3d 1357, 1365 (10th Cir. 1993)). A charge of futility is "based on whether a claim could survive a motion to dismiss;" therefore, the standards for resolving a motion to dismiss are relevant to determining whether granting leave to amend would be futile. *See Dean v. Marker Volkl USA, Inc.*, No. 15-CV-00190-RM-MEH, 2015 WL 3534163, at *2 (D. Colo. June 3, 2015).

In deciding a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, the Court presumes the truth of all well-pleaded facts in the complaint, but need not

7

consider conclusory allegations.  *Tal v. Hogan*, 453 F.3d 1244, 1252 (10th Cir. 2006), *cert. denied*, 549 U.S. 1209 (2007).  The Court is not bound by a complaint's legal conclusions, deductions, and opinions couched as facts.  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 565 (2007).  Furthermore, though all reasonable inferences must be drawn in the non-moving party's favor, a complaint will only survive a motion to dismiss if it contains "enough facts to state a claim to relief that is plausible on its face."  *Id.* at 570.  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

Additionally, for a claim to proceed under the FCA, the plaintiff must satisfy the heightened pleading standards of Rule 9(b) of the Federal Rules of Civil Procedure.  *See United States ex rel. Lemmon v. Envirocare of Utah, Inc.*, 614 F.3d 1163, 1167 (10th Cir. 2010).  Rule 9(b) demands that when "alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."  Fed. R. Civ. P. 9.

## DISCUSSION

"The FCA 'covers all fraudulent attempts to cause the government to pay out sums of money.'"  *Lemmon*, 614 F.3d at 1167 (citations omitted).  Section 3730(b) of the FCA permits *qui tam* actions, which allow an individual plaintiff to sue on behalf of the government.  Once a *qui tam* action is filed, the government may intervene and take over the plaintiff's case.  31 U.S.C. § 3730(b)(2).  If the government declines to intervene, the plaintiff or "relator" may proceed while sharing any recovery with the government.  31 U.S.C. § 3730(c)(3).  In this case, on February 19, 2015, the government declined to intervene; therefore, Barrick is proceeding as a relator under the FCA.  (Dkt. No. 55-1, ¶ 17.)

Barrick raises three claims under the FCA. First, Barrick alleges a reverse false claim under 31 U.S.C. § 3729(a)(1)(G). (*Id.* at ¶¶ 155–65.) Second, Barrick alleges a false claims conspiracy under 31 U.S.C. § 3729(a)(1)(C). (*Id.* at ¶¶ 166–78.) Finally, Barrick alleges Defendants fired Barrick in retaliation for his FCA reporting activities in violation of 31 U.S.C. § 3730(h). (*Id.* at ¶¶ 179–84.)

Defendants have not shown Barrick has acted with undue delay or bad faith in seeking leave to amend the First Amended Complaint. Furthermore, Defendants have not demonstrated they would suffer any prejudice if Barrick is granted leave to amend. Therefore, the only basis on which the Court can deny Barrick leave to amend is if the Court determines Barrick's motion is futile. For the reasons that follow, the Court finds granting Barrick leave to amend on his FCA reverse false claim and conspiracy claim would be futile. Barrick's retaliation claim, however, is sufficiently supported to be allowed to proceed.

**I. FCA Reverse False Claim & Conspiracy Claim**

Barrick alleges that Defendants' false statements resulted in an avoidance of a regulatory obligation to obtain and pay for FSIS Voluntary Inspections. The FCA's reverse false claims provision, § 3729(a)(1)(G), provides liability for anyone who:

> knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, *or* knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government . . .

31 U.S.C. § 3729(a)(1)(G) (emphasis added). Section 3729(a)(1)(G) "is called a reverse false claim because the action of the defendant results not in improper payment to defendant from the Government, but rather no payment to the Government when payment is otherwise obligated." *United States ex rel. Doe v. Dow Chem. Co.*, 343 F.3d 325, 329 (5th Cir. 2003). Section 3729(a)(1)(G) provides a civil cause of action, which can result in a penalty per violation of the

FCA and treble damages. *See* 31 U.S.C. § 3729(a)(1).[3] Additionally, § 3729(a)(1)(C) provides for liability where a party "conspires to commit a violation of" § 3729(a)(1)(G).[4] Here, the plausibility of Barrick's FCA claims depends on whether Barrick has alleged that Defendants' conduct resulted in an avoidance of an obligation to pay the government.

Barrick alleges that FSIS regulations impose an FCA obligation to pay the government when Defendants seek to ship U.S. beef to Japan and China. The FCA defines an "obligation" as "an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment." 31 U.S.C. § 3729(b)(3). Congress stressed that the statutory definition of "obligation" encompassed a "spectrum of possibilities from the fixed amount debt obligation . . . to the instance where there is a relationship between the Government and a person that 'results in a duty to pay the Government money, whether or not that amount owed is yet fixed.'" S. Rep. No. 111-10, at 14 (2009) (Conf. Rep.) (citations omitted). The Tenth Circuit has adopted a broad definition of an FCA

---

[3] Barrick alleges there are over 3,000 transactions in which Defendants violated the FCA. Barrick claims that he and the government are entitled to a civil penalty per violation and treble damages for any loss sustained by the United States. (Dkt. No. 55-1, ¶¶ 161(f); 162(f); 178.) Barrick alleges that Defendants are liable under the FCA for more than $40 million. (Dkt. No. ¶ 2.)

[4] In 2009, Congress enacted the Fraud Enforcement and Recovery Act ("FERA"), which modified the FCA in two ways. *See* The Fraud Enforcement and Recovery Act of 2009, Pub. L. 111-21, § 3730, 123 Stat. 1617, 1624–25 (2009). First, FERA "eliminated the requirement that a person make or use a false record or statement to avoid, conceal, or decrease an obligation to the United States." *See United States ex rel. Harper v. Muskingum Watershed Conservancy Dist.*, No. 5:13-CV-2145, 2015 WL 7575937, at *8 (N.D. Ohio Nov. 25, 2015). Second, FERA provided a statutory definition of an FCA "obligation." *See* 31 U.S.C. § 3729 (b)(3). The fraudulent conduct alleged by Barrick occurred from 2004 to 2012. (Dkt. No. 55-1, ¶ 130(g).) Therefore, Barrick's case involves application of the FCA before and after FERA. FERA provides that the "amendments made by [FERA] shall take effect on the date of enactment of [FERA] and shall apply to conduct on or after the date of enactment." 123 Stat. at 1625. FERA also provides that § 3729(a)(1)(B) "shall take effect as if enacted on June 7, 2008, and apply to all claims under the False Claims Act . . . that are pending on or after that date." *Id.* The Court does not need to distinguish between the conduct alleged by Barrick that occurred before and after 2009. As discussed below, whether the Court applies the FCA before or after FERA, the outcome is the same.

obligation, holding that fee-based regulatory burdens may be FCA "obligations" even where the obligation is not for a "precise amount" and where the obligation is contingent on government discretion. *United States ex rel. Bahrani v. Conagra, Inc*., 465 F.3d 1189, 1202–03 (10th Cir. 2006). Moreover, the existence of a regulatory obligation to pay is not enough for a reverse false claim to proceed. Section 3729(a)(1)(G) requires that false statement be "material to an obligation to pay . . . the Government." The FCA defines a false statement as "material" when the false statement has "a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4).

In this case, Barrick alleges that Defendants are subject to several obligations because of their "special relationship with the United States Government" as participants in the U.S. meat industry. (Dkt. No. 55-1, ¶ 92.) Specifically, Barrick alleges that Defendants have an obligation to: (1) be truthful with the government; (2) consult the export requirements for a recipient country; (3) truthfully designate the identity of the "intended destination country importing the U.S. meat product;" (4) obtain true and correct export certificates; (5) obtain requisite "inspections, verifications, and certifications" for the destination country; and (6) "ensure that the Government is compensated for the requisite inspections, verifications, and certification fees that are required for the intended destination country receiving the U.S. meat product." (*Id*. at ¶ 92(a)-(e).)

Barrick's flowery recitation of the Defendants' general duty to be honest is irrelevant to a reverse false claim under the FCA. The FCA does not punish dishonesty generally; rather, the FCA punishes dishonesty that is material to a monetary obligation owed to the government. *See* 31 U.S.C. § 3729(g) (stating liability attaches when a person uses a false record "material to an *obligation to pay*" or a person "knowingly and improperly avoids or decreases *an obligation to*

*pay* . . . ." (emphasis added)). In this case, the only plausible FCA obligation alleged by Barrick is Defendants' obligation to "ensure that the Government is compensated for the requisite inspections, verifications, and certification fees that are required for the intended destination country receiving the U.S. meat product." (Dkt. No. 55-1, ¶ 92(e).) This obligation requires the Court to focus on the specific FSIS regulations that govern how Defendants obtain export certificates to ship U.S. beef into Japan and China. Barrick describes the process of obtaining a FSIS export certificate as follows:

1. The applicant for an export certificate obtains a FSIS form 9060-6 Application for Export and specifies the "intended receiving country." (Dkt. No. 55-1, ¶¶ 47–49.)
2. The applicant then "causes" the Application for Export to be presented to an inspector for inspection. (*Id.* (citing FSIS Directives 9000.1 and 9040.1).)
3. A "Voluntary Inspection" occurs if the importing country has greater importation standards than what is required by the USDA. (*Id.* at ¶ 57 (citing FSIS Directive 12,600.1 at V.B.).)
4. During a "Voluntary Inspection," FSIS may be reimbursed for reviewing the Export Library (which contains the importation requirements for each country) and comparing the Application for Export with the Export Library, verifying that all the requirements of the importing country have been met, and signing the FSIS form 9290-1 Certificate of Export. (*Id.* at ¶ 60.)

Barrick alleges that Defendants avoided an FCA obligation because had Defendants been truthful to the fulfilling establishment, Defendants would have been required to obtain a FSIS Voluntary Inspection to ship beef to Japan and China. But this makes no sense in light of Barrick's own theory of his case. According to Barrick's own first-hand account, his employer was engaged in illegal shipments of U.S. beef to China and Japan. He claims that, in order to pull off this illegal exportation, Defendants lied to the inspectors about one thing and only one thing: the destination countries. In considerable detail, he spells out how Defendants misrepresented that the beef was going to Moldova, when it was actually destined for China, and that the banned beef destined for Japan was misrepresented as going to Costa Rica or Honduras.

Barrick then explains that these lies had to be told because a company cannot export beef out of the United States unless the company obtains an export certificate. He admits that if the inspector is told the meat is going to be consumed in Moldova, Costa Rica or Honduras, there is no cost or fee charged by the inspector for the inspection or the export certificate.

In making these detailed explanations, Barrick unquestionably demonstrates that Defendants committed fraud and that they misrepresented a material fact (the destination countries) to a government inspector. Indeed, that was precisely what Barrick told the FBI and it certainly got their attention, which led to a criminal indictment and a guilty plea to making a false statement. But, while it cannot be denied that all of these detailed allegations describe dishonesty, fraud, and a clearly illegal smuggling operation, there is nothing in them to support Barrick's claim that in perpetrating this scheme Defendants caused an avoidance of any obligation to pay any monetary fee to the United States. By Barrick's own facts, which for the present purposes the Court accepts as true, the last thing Defendants wanted, and never anticipated, was a Voluntary Inspection. What they were doing, according to Barrick, was smuggling banned U.S. beef into China and Japan, and it would be completely inconsistent with that activity to have anything to do with a fee attached to a U.S. inspection for meat that could never, ever, be subject to an inspection, let alone pass one. Barrick unequivocally admits in his Second Amended Complaint that the beef destined for China was banned in China because all U.S. beef was banned there. (Dkt. No. 55-1, ¶ 67(a).) Similarly, with respect to Japan, he clearly alleges that the Japan-based shipments were unqualified for (i.e., "banned" in) Japan. (*Id.* at ¶¶ 130(g), 136, 162(c).) To be sure, Defendants were sneaking beef out of the United States and smuggling it into China and Japan. What they were not doing was avoiding a fee. By Barrick's own account, if a Voluntary Inspection had occurred, the beef would not have passed,

13

no export certificate would have been issued, and the fraud scheme would have been stopped in its tracks.

Consideration of an analogous hypothetical may be helpful to understand the Court's analysis of Barrick's case. Imagine a U.S. law regarding the importation of ivory into the United States. The law divides ivory into three categories. Category I is ivory purchased in Europe, which may be freely brought into the United States with no customs duty. Category II is ivory purchased in Asia, which may be brought into the United States but is charged with a customs duty of ten dollars per pound. Category III is ivory purchased in Africa which is completely banned in the United States. Assume a traveler returning to the United States with ivory from a trip abroad. If he purchased the ivory in Asia and tells the customs agent he purchased the ivory in Europe, he will have committed fraud and avoided a fee. But if he purchased the ivory in Africa and tells the customs agent he purchased the ivory in Europe he will have committed fraud but will not avoid a fee because no fee could possibly attach to the product that was prohibited from importation into the U.S. at any price. The latter exchange is what we have in the instant case.

Barrick attempts to bolster his case by pointing to the Defendants' guilty plea, but on inspection, this plea only underscores that the Defendants' illegal actions had nothing to do with the avoidance of a fee. The Defendants' guilty plea statement is plainly an admission of making a knowing false statement in order to illegally ship banned beef out of the United States, as follows:

> On or about March 17, 2011, PARKER INTERNATIONAL INCORPORATED ("PARKER"), did knowingly make a false statement in a shipper's certificate or other nonofficial or official certificate provided for in the regulations prescribed by the Secretary of the United States Department of Agriculture ("USDA"); to wit: PARKER did state in an official USDA Food Safety and Inspection Service Mean and Poultry Export Certificate of Wholesomeness that its meat products

>were destined for Moldova, when in fact that statement was not true. That false statement was then relied upon by the USDA during the issuance of export certificates for product, and caused an export certificate to be granted when it otherwise would not have been granted.

This statement clearly admits misrepresenting facts about the destination country, which was necessary to successfully smuggle beef into China and Japan, but it in no way states or even suggests that a fee was being avoided.

Any careful examination of the two smuggling schemes reveals that avoiding a monetary fee to the government was not only irrelevant to Defendants' smuggling operation, but more importantly, did not, and could not, happen. As explained above, with regard to China, this is true, first and foremost, because U.S. beef was banned there and there was, and is, no such thing as a Voluntary Inspection for beef leaving the United States and bound for a country where it is banned. To allege that Defendants avoided a Voluntary Inspection under such circumstances is like arguing that a person carrying a bomb in a bag onto an airplane is trying to avoid a fee charged by the airline for an extra bag. But, of course, this metaphor is not a perfect fit for this case because the bomber, even if it was not his intent, actually *did* avoid a fee, whereas here Defendants' did not avoid any fee for the simple reason that there was no Voluntary Inspection that would lead to an export certificate that would allow shipments of banned beef to go to China. To suggest Defendants were in any way attempting to, or did, avoid a payment of a fee under these circumstances is implausible.

Barrick attempts to get around this problem by basing his entire China case on the fact that the beef en route to China was first delivered to Hong Kong. (Dkt. No. 61, p. 14.) Barrick alleges that Defendants were avoiding paying for a Voluntary Inspection required for meat that was going to Hong Kong. In addition to the obvious fact that Hong Kong was not the intended destination country, this attempt to connect to a fee fails because such an inspection would have

15

been totally unnecessary, unexpected, and completely inconsistent with the smuggling operation. All Defendants needed to commit their smuggling operation was what they in fact did: obtain a regular no-cost export certificate by telling the inspectors that the beef's destination was Moldova.  Under these circumstances, it begs reason to say Defendants should have sought a Voluntary Inspection that the beef was qualified for Hong Kong.  And, finally, even if there were any logical support for Barrick's effort to include Hong Kong as the reason for a Voluntary Inspection, which there is not, the effort still fails because Barrick has provided no allegation of any kind in his proposed Second Amended Complaint or elsewhere to suggest that there is a USDA regulation or Hong Kong regulation that requires a Hong Kong-specific Voluntary Inspection where Hong Kong is only a transit point en route to the final destination country of China.

With regard to the Japan scheme, the only possible way the Voluntary Inspection fee could come into play would be if the beef destined for Japan actually qualified to meet Japan's more demanding requirements, and the inspector was told the beef was destined for Costa Rica or Honduras, in order to avoid the Voluntary Inspection required for Japan and the fee attached to it.  But, aside from the fact that under the circumstances this is highly unlikely and implausible, the Second Amended Complaint fails to make this allegation.  To the contrary, Barrick, both in his previous complaints and the proposed Second Amended Complaint, has consistently stated that the beef in the Japan scheme was "banned" in Japan.  (*See, e.g.*, Dkt. No. 55-1, ¶¶ 130(g), 136, 162(c); Dkt. No. 21, ¶¶ 65, 75, 76.)[5]

---

[5] At oral argument, Barrick's counsel confirmed that much of the beef allegedly shipped into Japan by Defendants was banned by Japan's standards.  (*See* Hearing on Plaintiff's Motion for Leave to Amend, May 2, 2016, Tr. at 26:22–25, 27:1–4 ("It is banned beef product, and the reason that Parker was sending it through to Costa Rica and attempting to get it into Japan is because there is a huge amount of money to be made in shipping this banned product.").)

Furthermore, while not necessary to the Court's ruling that no monetary obligation was avoided, Barrick's complaint also suffers from the additional deficiency that there is no allegation that the establishments utilized by Defendants were qualified to ship beef into Japan and Hong Kong. According to the AMS, "[o]nly eligible suppliers listed in the [USDA's Business Directory] . . . may supply product identified as meeting the requirements of the applicable USDA EV Program" and "[o]nly eligible products may be issued a . . . [FSIS] Export certificate." *See AMS Export Verification*. Unless Defendants ordered beef from eligible establishments, a FSIS Voluntary Inspection could not occur and, therefore, for this additional reason Barrick has failed to allege Defendants' conduct resulted in an avoidance of an obligation to pay for FSIS Voluntary Inspections.

Accordingly, based on Barrick's first-hand account, there is no basis in fact to support his claim that amidst all of this illegality any monetary obligation owing to the United States was avoided. Therefore, Barrick will be denied leave to amend on his reverse false claim and conspiracy claim.[6] Granting Barrick leave to amend would be futile as Barrick's Second Amended Complaint fails to state a plausible claim for relief under the FCA.

## II. Pleading FCA Retaliation

Barrick alleges that he was fired from his employment with Defendants for engaging in protected FCA activities. The FCA's anti-retaliation provision, § 3730(h)(1), provides relief to any employee who:

> is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment *because of lawful* acts done by the employee, contractor, agent or associated others *in*

---

[6] Neither party addressed Barrick's conspiracy claim. To the extent a conspiracy claim could be alleged by Barrick, the Court finds that Barrick's allegations of a conspiracy fail. *See United States ex rel. Conner v. Salina Reg'l Health Ctr., Inc.*, 459 F. Supp. 2d 1081, 1091 (D. Kan. 2006). As delineated above, there are no allegations before the Court that Defendants conspired to avoid FSIS Voluntary Inspection fees. At most, Defendants conspired to import banned U.S. beef product into Japan and China.

> *furtherance of an action* under this section or other efforts to stop 1 or more violations of [the FCA].

31 U.S.C. § 3730(h)(1) (emphasis added). To sustain a claim under § 3730(h), a whistleblower or employee must "plausibly allege facts showing that: (1) the employee engaged in protected activity; (2) the employer received notice of the employee's protected activity; and (3) the employer discriminated against or discharged the employee for engaging in protected activity." *United States ex rel. Feaster v. Dopps Chiropractic Clinic, LLC*, No. 13-1453-EFM-KGG, 2015 WL 6801829, at *7 (D. Kan. Nov. 5, 2015).

The issue in this case is whether Barrick has pled that Defendants had notice of Barrick's FCA activates. To adequately plead notice, Barrick is required to provide the Court "'facts which would demonstrate that [D]efendants had been put on notice that [Barrick] was either taking action in furtherance of a qui tam action or assisting in an FCA action brought by the government.'" *Sikkenga*, 472 F.3d at 729 (citations omitted); *McBride v. Peak wellness Ctr., Inc.*, 688 F.3d 698, 704 (10th Cir. 2012); *Feaster*, 2015 WL 6801829, at *7. "Notice may be provided in a number of ways: for example, by informing the employer of 'illegal activities' that would constitute fraud on the United States, . . . by warning the employer of regulatory noncompliance and false reporting of information to a government agency, . . . or by explicitly informing the employer of an FCA violation." *McBride*, 688 F.3d at 704 (citations omitted).

Barrick alleges that after he filed his original complaint under seal, the FBI initiated an investigation into the Defendants' business. (Dkt. No. 55-1, ¶ 141.) Barrick aided the FBI's investigation, including wearing a "hidden recording devise" during conversations with Defendants' CFO Steven Johnson ("Johnson"). (*Id.* at ¶ 141(c).) During the FBI's investigation, the FBI interrogated Johnson about "specific facts given to them by [Barrick]." (*Id.* at ¶ 146.)

On November 14, 2013, one month after the FBI searched the Defendants' business premises, Barrick was terminated from his employment. (*Id.* at ¶ 92.)

The Court finds that Barrick's retaliation claim states a plausible claim for relief under the FCA. If the FBI interrogated Johnson with specific statements made to Barrick, then it is plausible that Johnson had knowledge Barrick was aiding the FBI before Barrick's termination. *See Twombly*, 550 U.S. at 570. Therefore, Barrick is granted leave to amend on his FCA retaliation claim.

## SUMMARY & CONCLUSION

The False Claims Act can be violated in one of two ways. Both involve monetary losses to the United States Government. The first happens when the government pays money it shouldn't have. The second happens when the government doesn't receive money it should have. In this case, Barrick seeks to prove the latter. But his theory claims a smuggling operation with no plausible corresponding monetary obligation. What Barrick's employer did was unquestionably illegal, but avoided no monetary obligation to the United States. The export certificates Defendants received were free and the ones that cost money, upon which Barrick's entire case rests, are entirely inconsistent with, and contrary to, the fraud scheme Barrick presents.

It may be that Barrick's *qui tam* action could find a proper home in some other section of the United States Code, but it does not fit within the False Claims Act. Barrick's retaliation claim, however, appears to be supported by sufficient facts to survive a motion to dismiss.

Barrick is denied leave to amend on his claims under § 3729(a)(1)(G) and § 3729(a)(1)(C) of the FCA, as leave to amend is futile. Barrick is granted leave to amend on his §

3730(h) retaliation claim. Barrick's Motion for Leave to Amend (Dkt. No. 55) is DENIED IN PART and GRANTED IN PART.

Dated this 25th day of May, 2016.

                                      BY THE COURT:

                                      _____
                                      Dee Benson
                                      United States District Judge